# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9514 | **DATE** | 2/26/2003 |
| **CASE TITLE** | Juanita Collins vs. A.T. Kearney, Inc. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendant A.T. Kearney, Inc.'s motion for summary judgment [10-1] is granted. This case is hereby terminated. This is a final and appealable order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | Document Number |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | FEB 2 7 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | U.S. DISTRICT COURT CLERK 03 FEB 27 AM 8:24 FILED-ED TO Date/time received in central Clerk's Office | date mailed notice | |
| | | | mailing deputy initials | |



JUANITA COLLINS, )
)
    Plaintiffs, )
)
v. )      **Judge Ronald A. Guzman**
)      **01 CV 9514**
A. T. KEARNEY, INC., )
)
    Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Juanita Collins has filed a complaint against A. T. Kearney, Inc. for

racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended

by the Civil Rights Act of 1991, 42 U.S.C. §2000(c) *et seq.*, ("Count I"), violation of the

Civil Rights Act of 1866, 42 U.S.C. §1981 ("Count II"), as well as retaliation ("Count

III" under Title VII). Pending is defendant's A. T. Kearney, Inc.'s motion for summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons

provided in this Memorandum Opinion and Order, the Court grants defendant's Motion

for Summary Judgment.

## FACTS

A. T. Kearney, Inc., ("ATK") is a management consulting and executive search

firm doing business in Illinois. (ATK's Statement of Facts ¶ 1). ATK hired Collins, in

1990. (*Id.*, ¶ 9). Initially, Collins worked in ATK's Information Research Center ("IRC")

as a Research Assistant. (*Id.* ¶ 10). On February 8, 1996, Collins became an Information

1



Specialist. (*Id.* ¶ 11).

ATK's IRC is comprised of two distinct divisions of employees: (1) IRC Research and (2) IRC Operations. (*Id.* ¶ 12). As an Information Specialist, Collins worked in the IRC Research Division. (*Id.* ¶ 13). Individuals working in the IRC Research Division are termed "value added" because they bill ATK's clients for their time conducting research as well as capturing and providing intellectual capital. (*Id.* ¶ 14). These employees also conduct research requested by consultants to support ATK's consulting projects. (*Id.*). Individuals working in the IRC Operations Division are not "value added" because they do not bill their time to clients. (*Id.*).

From 1990 until January, 2000, Collins was employed in the IRC Research Division, where she was a "valued added" employee. (*Id.* ¶¶ 9-11, 20). While working in the IRC Research Division, Collins was supervised by Debra Hammond ("Hammond") from 1990 until 1997. (*Id.* ¶ 15).

In five (5) evaluations between 1990 and 1994, for example, Collins averaged, out of twelve (12) applicable criterion, six (6) scores of "Outstanding and Six(6) scores of "Exceeds Expectations." Not only that, but her worst evaluations was in fact her first one; she was improving. Comments include "always ready to help others," never leaves a stone unturned," "goes extra mile," "she is an industrious and resourceful individual producing quality results with service," and that Collins was a "tremendous asset." (Facts ¶4).

In 1997, Collins was rated at a "1.75" level, admittedly a little below her usual high level, but even then she was praised for her extra efforts in seeking out training in new technologies, her hard work, and humor and graciousness, and how she "stepped up

2

to the plate." (Facts ¶5).

In 1998, Noreen Curran ("Curran") became manager of the IRC Research Division and began to directly supervise Collins. (*Id.* ¶ 17). Sometime between 1998 and October, 1999, Collins claims that Curran continuously treated Collins in a discriminatory manner and made the following remarks: (1) when a co-worker brought her baby to work Curran allegedly stated that "now he [*i.e.*, the baby] can see his first woman of color (*i.e.*, Collins);" and (2) while Collins was ordering wine during a lunch attended by her co-workers Curran allegedly stated "Juanita would you please hurry up? They don't serve black wine." (*Id.* ¶ 18). Curran also slammed the door twice while Collins was talking nearby to co-workers. Thereafter, on or about January of 2000, Collins complained about these comments to Jim Pearson, the newly appointed IRC American Director. (*Id.* ¶ 19).

Although Collins admits that Jim Pearson immediately reported Collins' January, 2000 complaint to the ATK personnel department on or about February 7, 2000, she denies that an investigation immediately ensued or that Lisa Lyons, a member of ATK's personal department, investigated. (ATK's Statement of Facts ¶¶ 85-86; Pls.' Reply to Def.'s Statement of Facts ¶¶ 85-86). Shortly after this alleged investigation, Jim Pearson asked Collins if she wanted to work under Patricia Porter. (ATK's Statement of Facts ¶ 87). Collins agreed and, early in 2000, began a transitional period during which she worked part-time for the IRC Operations Division and part-time for the IRC Research Division. (*Id.* ¶ 20). Collins' supervisor remained Curran while she continued to work for the IRC Research Division during this transition. (*Id.* ¶¶ 21, 88). Collins' initial supervisor while she worked for the IRC Operations Division was Patricia Porter

("Porter"). (*Id.* ¶¶ 22, 88).

After approximately three months of splitting her time between the two divisions, Collins completely ceased working for the IRC Research Division and began working for the IRC Operations Division and Porter full time. (*Id.* ¶ 23). Collins admits that after this transitional period, Porter became her full time supervisor, with Chris Julius replacing Porter in September, 2000. (*Id.* ¶ 24). Collins admits ATK's claim that this change was good for her but only with respect to the distance it provided her from Curran. (ATK's Statement of Facts ¶ 25; Pls.' Reply to Def.'s Statement of Facts ¶ 25). However, Collins contests ATK's assertion that after Porter became Collins' full time supervisor Curran no longer had authority over Collins. (ATK's Statement of Facts ¶ 26; Pls.' Reply to Def.'s Statement of Facts ¶ 26). Collins worked for the IRC Operations Division until her employment was terminated on June 1, 2001. (ATK's Statement of Facts ¶ 76).

The IRC Operations Division is an in-house, support group that maintains all of ATK's internal records. (*Id.* ¶ 27). The IRC Operations Division focuses almost entirely upon providing infrastructure to the Research Division, as well as to ATK in general. (*Id.* ¶ 27). The IRC Operations is also responsible for ATK's Client Master File. (*Id.* ¶ 28). The Client Master File is a system that maintains and tracks clients internally while maintaining relevant information in regards to the changing business world. (*Id.* ¶ 27). The Client Master File is ATK's master list of its clients (*i.e.*, client name, parent name, address, industry, and the ATK office responsible for the client). (*Id.* ¶ 29). It tracks all of ATK's clients over the past twenty years, factors the compensation calculation of ATK officers and consultants, and feeds data into ATK's Client Engagement database as well as several other core application/databases requiring client information. (*Id.* ¶¶ 32, 37).

4

The Client-Master feed is also used to evaluate and determine potential bonuses of ATK officers and consultants working for ATK's various industry practices. (*Id.* ¶ 33). Client Master Industry SIC codes determine to which industry practice the client belongs. (*Id.*). For all of these reasons, the Client Master File is a vitally important system for ATK. (*Id.* ¶ 32).

Collins' primary job following her transfer to the IRC Operations Division involved global oversight of ATK's Client Master File. (*Id.* ¶ 30). In working on the Client Master File, Collins was required to determine a new client's corporate information, research the client's corporate information in a reputable published or on-line source, and accurately enter such information into the Client Master File. (ATK's Statement of Facts ¶ 38). She was also responsible for identifying and correcting ("cleaning up") any errors in the Client Master File that had resulted from earlier data input, or that was due to information being simply outdated. (*Id.*).

Pia Halme ("Halme") was appointed ATK's Global IRC Director in January, 2001. (*Id.* ¶ 51). Collins denies that ATK management was very concerned about errors within the Client Master File, which ATK contends impeded its ability to adequately service its clients, affected its ability to report accurately client billing and booking, and affected the performance evaluation and compensation of officers and consultants. (ATK's Statement of Facts ¶ 59; Pls.' Reply to Def.'s Statement of Facts ¶ 59). Collins denies that Halme was instructed to take all necessary steps to fix the Client Master File (ATK's Statement of Facts ¶ 60; Pls.' Reply to Def.'s Statement of Facts ¶ 60).

In her review of the Client Master File, Halme claims to have found numerous significant errors when she reviewed the data entries of the Client Master File made

during the time in which Collins maintained global responsibility for the Client Master File. (ATK's Statement of Facts ¶¶ 39-43; Pls.' Reply to Def.'s Statement of Facts ¶¶ 39-43). Halme explains that incorrect industry codes resulted in errors in reports and conclusions about the level of business generated by ATK officers and consultants. (ATK's Statement of Facts ¶ 43; Pls.' Reply to Def.'s Statement of Facts ¶ 43). The errors included incorrect parent or client information, misspellings of parent or client entities, missing client address information, and incorrect industry codes. (ATK's Statement of Facts ¶ 40). Halme determined that the errors in client names resulted in the inability of ATK to tract previous client engagements when searched by client name. (*Id.* ¶ 41). Collins denies ATK's assertions that incorrect parent data resulted in errors in reports to the CEO's office. (ATK's Statement of Facts ¶ 42; Pls.' Reply to Def.'s Statement of Facts ¶ 42).

Collins admits that she likely made errors while she was entering data into the Client Master File. (ATK's Statement of Facts ¶ 44). Halme determined that these errors were likely a result of Collins' unfamiliarity with the language and local market conditions of ATK clients in non-English speaking countries. (*Id.* ¶ 45). Collins admits that it was difficult for her to accurately input all the information into the Client Master System and that such duties were "overloading." (*Id.* ¶ 46). Collins concedes that even though her job duties included cleaning up the Client Master File, she did not perform this duty unless, by chance, she happened to see an error while she was inputting data into the Client Master File. (*Id.* ¶ 47). However, while admitting that the Client Master File is an extremely important collection of information, and is at the core of ATK's financial reporting system as well as ATK's intellectual capital, Collins alleges that

Arlene Arp and/or other supervisors ordered actions inconsistent with Client Master Accuracy. (ATK's Statement of Facts ¶¶ 34-36; Pls.' Reply to Def.'s Statement of Facts ¶ 34).

That being said, her performance evaluation made during the time period in which she was solely responsible for the Client Master File was below "meets expectations." (*Id.* ¶ 48). The evaluation in question, signed by Collins' final supervisor Chris Julies, gave her an overall rating of 2.5 (where 1 is the best score of "exceeds expectations," 2 is "meets expectations," and 3 is "does not meet expectations. (Facts ¶29). This overall score, however, is inconsistent with the rest of the evaluation. Julius graded Collins a "2" in three categories: Communication, Professional Cooperation and Adherence to ATK's Policies and Procedures. (Facts ¶30). He graded Collins a "2.5" on only two categories: Professional Standards of Behavior and Project Management. (Facts ¶30). Chris Julius, Pat Porter, and Jim Pearson had input on her 2000 evaluation, although there is disagreement whether they actually evaluated her. (ATK's Statement of Facts ¶ 49; Pls.' Reply to Def.'s Statement of Facts ¶ 49).

In January 2001, Pia Halme was appointed as Global IRC Director. As Global Director of IRC, Halme claims that she was shouldered with the duty of establishing a 24-hour research center in India for all of ATK worldwide, that the task required a two million dollar IRC budget reduction for 2001, and that she was given complete authority over all IRC staffing and budgetary concerns to meet her agenda. (ATK's Statement of Facts ¶¶ 52-54; Pls.' Reply to Def.'s Statement of Facts ¶¶ 52-54).

Halme states that the only way in which the Research Center in India could be established, within her budget, was by eliminating IRC staff from other parts of the

world.

(ATK's Statement of Facts ¶ 56; Pls.' Reply to Def.'s Statement of Facts ¶ 56).

Thus, Halme began making her labor cuts in the United States IRC division because the

cost of labor in the United States is the highest in the world and because staff reductions

within the U.S. IRC Operations Division would not affect ATK's "value added"

business. (ATK's Statement of Facts ¶¶ 57- 58; Pls.' Reply to Def.'s Statement of Facts

¶¶ 57-58).

Halme claims that in accord with her directive the responsibility of the Client

Master File was no longer to be centralized, but rather divided among value added

researchers as part of their other duties. (ATK's Statement of Facts ¶ 62; Pls.' Reply to

Def.'s Statement of Facts ¶ 62). These researchers were to be employed at various

locations through the world and possess the language skills and local market knowledge

necessary to accurately enter the Client Master File information of the ATK clients in

their region. (ATK's Statement of Facts ¶ 63).

Collins argues that her duties (*i.e.*, to provide world-wide clean up) was not

eliminated but instead was assigned in part to two "value added" researchers: Lori Sacco

and Pat Malloy, who are both white, and who were assigned only the clean-up effort for

North America. (ATK's Statement of Facts ¶¶ 66, 70; Pls.' Reply to Def.'s Statement of

Facts ¶¶ 31, 65, 66, 70). Collins also claims that ATK assigned Arlene Arp to input

information and clean up the Master Client File after Collins' termination. (Pls.' Reply to

Def.'s Statement of Facts ¶ 66). In addition, Collins alleges that Halme provides no

support for her assertions that Lori Sacco and Pat Malloy performed the clean up

responsibilities in addition to their other "value added" duties, that for all other countries

outside of North America the clean-up was assigned to each local IRC, and that following the clean-up of the Client Master File, these global individuals, including Lori Sacco and Pat Malloy, retained the responsibility of inputting data into the Client Master File, in addition to their other value added duties. (ATK's Statement of Facts ¶¶ 67-69; Pls.' Reply to Def.'s Statement of Facts ¶¶ 67-69). Therefore, Collins claims that it is improper to speak of her job as being eliminated since her job duties were not eliminated but, rather, were assigned to more employees. (Pls.' Reply to Def.'s Statement of Facts ¶ 71). However, Collins does admit that it was a good idea for ATK to divide the responsibility for the Client Master File among other individuals throughout the world. (ATK's Statement of Facts ¶ 64).

ATK asserts, and Collins denies, that the need to make the employment cuts in the United States IRC Operations Division, as well as Halme's determination that a single person should not be solely responsible for maintaining the Client Master File (and that Client Master File Duties should be spread to other value added individuals worldwide), resulted in Halme's decision to eliminate Collins' job position and to terminate Collins' employment. (ATK's Statement of Facts ¶¶ 61, 71; Pls.' Reply to Def.'s Statement of Facts ¶¶ 61, 71). Collins also denies that Halme was the sole decision maker relative to the elimination of Collins' position and termination of Collins' employment. (ATK's Statement of Facts ¶ 72; Pls.' Reply to Def.'s Statement of Facts ¶ 72). Collins also challenges Halme's assertion that she never conversed with Curran involving Collins' termination and that Curran had no involvement and no influence on Halme's decision to terminate Collins' employment. (ATK's Statement of Facts ¶¶ 73-74; Pls.' Reply to Def.'s Statement of Facts ¶¶ 73-74). Collins does admit, though, that

she had no working or personal experience with Halme. (ATK's Statement of Facts ¶ 75).

Collins denies that, in addition to terminating Collins, Halme also terminated several Caucasian employees who worked in the United States IRC Operations Division, who were all non-value added employees, and Research Division. (ATK's Statement of Facts ¶¶ 77-78; Pls.' Reply to Def.'s Statement of Facts ¶¶ 77-78). In addition, Collins denies that none of the individuals so terminated ever made a complaint to ATK about discrimination. (ATK's Statement of Facts ¶ 80).

Collins believes that Curran was involved in the decision to terminate her employment, yet she admits that she was unaware of who actually made the decision to terminate her employment. (ATK's Statement of Facts ¶ 81). Collins admits that, other than Curran, none of her other direct supervisors ever engaged in discrimination or retaliatory conduct toward her. (*Id.* ¶ 82). However, Collins denies any knowledge of whether Halme discriminated against her. (*Id.* ¶ 83). Collins admits that other ATK non-management employees never told her that Curran played a role in her employment termination. (ATK's Statement of Facts ¶ 84; Pls.' Reply to Def.'s Statement of Facts ¶ 84). Finally, Collins denies ATK's claim that she does not have a discrimination claim against them and that she is not challenging her 2000 Performance Evaluation. (ATK's Statement of Facts ¶ 50; Pls.' Reply to Def.'s Statement of Facts ¶ 50).

Collins' employment was terminated on June 1, 2001. (*Id.* ¶ 76). On or about August 6, 2001, Collins filed a charge of discrimination with the Equal Employment Opportunity Commission. (*Id.* ¶ 89). On or about December 13, 2001, Collins alleges that she filed the present lawsuit against ATK and not Curran as ATK mistakenly asserts. (ATK's Statement of Facts ¶ 90; Pls.' Reply to Def.'s Statement of Facts ¶ 90). ("Count

I"), and the Civil Rights Act of 1866, 42 U.S.C. §1981 ("Count II"), as well as for

retaliation ("Count III"). (Collins' Compl.). Collins claims that she was retaliated against

for reporting Curran's discriminatory conduct to ATK management in January, 2000.

(ATK's Statement of Facts ¶ 90;Collins' Compl. ¶ 42).

## DISCUSSION

Summary judgment is proper when a party in opposition to the motion does not

make a sufficient showing establishing an essential element of its case that the party

would bear the burden of proving at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). The moving party bears the initial burden of demonstrating an absence of

material facts, entitling it to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 157 (1970). After reviewing the evidence in a light most favorable to the

non-moving party a summary judgment motion should be granted when there are no

issues of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## DISCRIMINATION IN VIOLATION OF TITLE VII & SECTION 1981

"Discrimination claims under both Title VII and § 1981 are analyzed in the same

manner." *Patton v. Indianapolis Pub. Sch. Bd.*, 266 F.3d 334, 338 (7th Cir. 2002). (citing

*Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998)). Collins may demonstrate

discrimination in one of two ways. She may show direct evidence of discrimination or

proceed "under the indirect, burden shifting approach established in *McDonnell*

*Douglas*." *Testerman v. EDS Tecc. Prods. Corp.*, 98 F.3d 297, 301 (7th Cir. 1996). In

order to prove discrimination directly, the plaintiff "must present 'evidence which if

believed by the trier of fact, will prove the particular fact in question without reliance on

interference or presumption.'" *Cowan v. Prudential Ins. Co.*, 141 F.3d 751, 760 (7th Cir.

1998). In addition, the evidence in question must "'not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question.'" *Id.*

Collins never clearly indicates which test ought to be applied to her discrimination claim. After applying both tests, though, the Court finds that Collins' claims fail as a matter of law. Even taking as true the fact that Curran uttered the racially insensitive comments as Collins has alleged, these statements do not "directly" speak to the "specific employment decision in question," Collins' termination. (ATK's Resp. to Collins' LR 56.1 ¶¶ 9-10; Collins' Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 10; Collins' Compl. Counts I and II.).

"A decisionmaker's use of racially charged language ... does not alone constitute direct evidence of discrimination. 'To rise to the level of direct evidence of discrimination ... isolated comments must be contemporaneous with the [adverse action] or causally related to the [applicable] decision-making process.'" *Adams v. Triton Coll.*, 35 Fed. Appx. 256, 259 (7th Cir. 2002) (omitting citations) (finding a two year gap between comments and the alleged adverse job action too great to establish a link). Collins has provided no direct evidence that this statement played any role in her termination or that Curran evaluated Collins during the time she was responsible for the Client Master File. (ATK's Statement of Facts ¶¶ 19, 30, 48, 50; ATK's LR 56.1 Ex. B). It is also not relevant in terms of timing. Hence, Collins offers no direct evidence of discrimination in her firing.

Therefore, in order for Collins' discrimination claims to survive ATK's motion for summary judgment, she must present evidence of indirect discrimination under the

burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). Under the *McDonnell Douglas* approach, Collins must first establish a *prima facie* case of discrimination. If she can establish such a case, the burden of production then shifts to ATK to demonstrate some legitimate, non-discriminatory reason for terminating Collins. *Id.* If ATK meets its burden, the onus then lies with Collins "to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

In order to establish a *prima facie* case, Collins must establish that: (1) she is a member of a protected class; (2) she has suffered an adverse employment action; (3) she was meeting ATK's legitimate performance expectations; and (4) ATK treated similarly situated employees who were not in the protected class more favorably. *Maarouf v. Walker Mfg. Co.*, 210 F.3d 750, 752 (7th Cir. 2000).

It is undisputed that Collins meets the first requirement because she is a member of a protected class (*i.e.*, an African American). (ATK's Statement of Facts ¶ 9; Pls.' Reply to Def.'s Statement of Facts ¶ 9). It is also undisputed that Collins meets the second requirement because she was terminated on June 1, 2001. (ATK's Statement of Facts ¶ 76; Pls.' Reply to Def.'s Statement of Facts ¶ 76).

In attempting to meet the third requirement, Collins relies upon the fact that prior to her 2000 evaluation, Collins had received satisfactory evaluations. (Pl's Mem. of Law in Opp'n to Def's Mot. for Summ. J. at 8). As Collins' says, "at all points before Curran became her supervisor, Collins received evaluations that indicated she performed above expectations. (*Id.* at 10). However, to establish a *prima facie* case, Collins is required to

13

show that she "was performing well at the time of her termination." *Salvadori v. Franklin Sch. Dist.*, 293 F.3d 989 (7th Cir. 2002); *see also, Jones v. Union Pac. R.R. Co.*, 203 F.3d 735, 741-42 (7th Cir. 2002) (requiring the plaintiff to show that she "was meeting the expectations of the employer either before or up to [her] termination"). ATK has presented unrebutted evidence that Collins was not performing her job adequately at the time of her termination and thus her nonperformance impacted ATK.

However, even if Collins were to meet the first three requirements, she would still fail to establish a *prima facie* case because she provides no examples of similarly situated employees. To meet her burden of demonstrating that another employee is similarly situated, Collins "must show that there is someone who is directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002); *Patterson v. Sprint/United Mgmt. Co.,* 00C5031, 2002 U.S. Dist. LEXIS 4811, at *11 (March 22, 2002) (requiring plaintiffs to point to "truly similarly situated employees" in order to raise a colorable claim that other employees were treated differently). "Employees are similarly situated when there is a 'substantial similarity' between their positions, such as a common supervisor and similar standards governing their performance.'" *Adams*, 35 Fed. Appx. at 259 (omitting citation).

Collins provides no evidence that "other non-African American similarly situated employees' positions were not phased out." (Pl.'s Compl. ¶¶ 29 § F, 35 § E). Instead, Collins broadly asserts that failure of ATK to eliminate "the IRC Operations Department, staff workers therein, or all 'Information Specialists'" is an indication that similarly situated employees were treated differently. (Pl.'s Mem. of Law at 10). In addition, Collins claims, without providing support or citation, that the "Defendant admits there

14

were some (*i.e.*, employees not in Collins' class who were treated more favorably)." (Pl's Mem. of Law at 13). However, in these assertions Collins paints with too broad a brush. What was needed in the place of these broad assertions were the names, races, job duties, or any other actual evidence that other employees were sufficiently similar to Collins' to be "directly comparable to her in all material respects." *Patterson*, 281 F.3d at 680.

Even if Collins could establish a *prima facie* case for summary judgment purposes, her claim would fail because ATK has offered a legitimate non-discriminatory reason for her termination and Collins has offered no evidence of pretext. *See Pilditch v. Bd. of Educ. of the City of Chi.*, 3 F.3d 1113, 1117 (7th Cir. 1993) (finding the burden of establishing a non-discriminatory reason "quite light": "the employer need not persuade the court that he was actually motivated by the reason he gives ... the mere articulation of the reason rebuts the prima facie case and puts the onus back on the plaintiff to prove pretext")

In order to establish pretext, Collins "must 'produce evidence from which a rational fact finder could infer that ...[ATK] lied about it proffered reasons' for the adverse employment" action. *Calhoun v. Potter*, 00C4056, 2002 U.S. Dist. LEXIS 4810, at * (March 22, 2002) (quoting *Weisbot v. Med. Coll. of Wis.*, 79 F.3d 677, 682 (7th Cir. 1996)). "Pretext means a lie, specifically a phony reason for some actions." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 348 (7th Cir. 1997). "[A] reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination." *Kariotis v. Navistar Int'l Transp., Corp.*, 131 F.3d 672, 677 (7th Cir. 1997). Collins could show pretext by demonstrating "that the proffered reason had no basis in fact, did

not actually motivate the employment action, or was insufficient to motivate the action."
*Adams*, 35 Fed. Appx. at 259 (omitting citation). Or, to prevail, Collins could "provide
evidence that would enable a trier of fact to find that the employer did not honestly
believe the reasons it gave for terminating him." *Campbell v. Dwyer Prod. Corp.*, 31 Fed.
Appx. 916, 919 (7th Cir. 2002). But, Collins has provided no "'significantly probative
admissible evidence' from which the tier of fact could infer that the employer's reason
was false and that the actual reason was discriminatory." *Jones*, 203 F.3d at 742-43.
Instead, Collins has chosen once again to turn to broad, unsupported assertions (*e.g.*,
"there is more than sufficient evidence for a reasonable jury to disbelieve Defendant's
legitimate non-discriminatory rational as pre-textual") at the cost of providing evidence
that ATKs' reported reasons are pre-textual. (Pl.'s Mem. of Law at 7).

Collins has attempted to imply that race was the motivating factor behind her
discharge. In support of this contention, she has emphasized the racial discrimination
that lies behind Curran's remarks. This Court assumes as true that on at least two
occasions Curran "unambiguously commented on" Collins' race and that Curran
"comments were not isolated incidents, but part of a pattern of demeaning treatment or
singling out of Collins by Curran." (Pl's LR 56.1 ¶¶ 9, 10, 13). However, that these
statements were made is not the relevant question. The relevant question before this
court is whether Curran, or her discriminatory opinions, had an impact on Collins or the
decision to terminate Collins. *Id.* Collins has provided no evidence that Curran had any
influence on ATK's decision to terminate Collins. Collins has provided no evidence that
Halme discriminated or retaliated against Collins. Finally, Collins has provided no
evidence that Curran's 1999 evaluation influenced the 2000 evaluation of Collins.

ATK has offered at least two non-discriminatory reasons for Collins' termination. First, ATK cites her poor performance while working on the Client Master File. In response, Collins points to the poor evaluation Curran gave Collins in 1999. (Pl's LR 56.1 Ex. J). However, Collins does not address the 2000 evaluation. (Def's LR 56.1 Ex. 4B). Collins only states that Curran was involved in the 2000 evaluation without providing any evidence to support this contention. (Pl's LR 56.1 ¶ 27) "We have long held that 'statements by nondecisionmakers cannot satisfy a plaintiff's burden of proving discrimination.'" *Jones*, 203 F.3d at 743. In addition, Collins admits that she made errors while entering data into the Client Master File, had difficulty accurately inputing all of the information into the Client Master System, and only performed her clean-up duties when, by chance, she happened to see an error while she was inputting data into the Client Master File. (Pl's Repl. Def.'s LR 56.1 ¶¶ 38-48). In addition to failing to rebut this nondiscriminatory reason for her termination, Collins admits that she deficiencies in her performance. (Pl's Repl. Def's LR 56.1 ¶¶ 38-38).

Second, Collins provides no evidence to refute ATK's contention that Collins' termination was made based on the need to reorganize the Client Master process to include input from ATK's many foreign offices and to cut labor costs in the United States. (Pl's LR 56.1 ¶ 42).

For these reasons, Collins' discrimination claims, therefore, cannot survive ATK's motion for summary judgment.

## RETALIATION

In the past year, the Seventh Circuit has created "a new rule for the adjudication of retaliation cases." *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th

Cir. 2002). Under *Stone*, plaintiffs in retaliation cases "have two (and only two) distinct routes to obtaining/preventing summary judgment." *Id.* The Seventh Circuit found that a "plaintiff can prove retaliation "either using direct evidence or under the *McDonnell Douglas* framework." *Thompson v. Madden Mental Health Ctr.*, 35 Fed. Appx. 413, 418 (7th Cir. 2002). Under the direct evidence test, the Collins is required

> to present direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that he engaged in protected activity ... and as a result suffered the adverse employment action of which he complains. If it is contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive; in that event the defendant is entitled to summary judgment because he has shown that the plaintiff wasn't harmed by retaliation. *Stone*, 281 F.3d at 644.

Direct evidence, however, "frequently does not exist in these cases." *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 465 (7th Cir. 2002). As stated above, Collins fails "to present evidence of direct discriminatory intent." *Dority v. City of Chi.*, No. 01-3855, 2002 U.S.App. LEXIS 21251, at *14 (7th Cir. September 5, 2002); *see also Stone*, 281 F.3d at 644. As a result, the Court will consider the Collins' retaliation claim "under the *McDonnell Douglas* burden shifting analysis." *Dority*, 2002 U.S.App. LEXIS 21251, at *14.

Under the *McDonnell-Douglas* test, Collins must

show that after filing the charge only he, and not any similarly situated employee, who did not file a charge, was subjected to an adverse employment action even though he was performing this job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial. *Stone*, 281 F.3d at 644.

Applying the *McDonald-Douglas* test to the facts of this retaliation claim, to

18

establish a *prima facie* case, Collins must show that [1] after engaging in a protected activity, [2] she, and not any similarly situated employee who did not complain, was [3] subjected to an adverse employment action even though [4] she was performing her job in a satisfactory manner. *See Stone*, 281 F.3d at 644; *McKay*, 2002 WL 664024, at *4, *27.

This Court assumes as true that on two occasions Curran "unambiguously commented on" Collins' race and that Curran "comments were not isolated incidents, but part of a pattern of demeaning treatment or singling out of Collins by Curran." (Pl's LR 56.1 ¶¶ 9, 10, 13). In addition, this Court also assumes as true that Collins informed her former supervisor, Hammond, of this treatment. (Pl's LR 56.1 ¶ 16). With these facts taken as true, Collins has engaged in statutorily protected expression. In addition, as was said above, her termination indicates that she suffered an adverse employment action.

Collins, though, cannot prevail under the adaptation of the *McDonnell Douglas* burden shifting analysis for retaliation claims. In both her initial pleading and her response to the ATK's Motion for Summary Judgment, Collins fails to provide "any evidence that any similarly-situated employee who did not [complain of discrimination] was treated differently." *Spencer v. Thomas*, 30 Fed. Appx. 636, 639 (7th Cir. 2002). The Seventh Circuit has consistently held that under *McDonnell Douglas*, a retaliation claim must fail when the plaintiff does not identify "similarly situated employees who did not engage in protected activity and whom ... [were] treated more favorably." *Thompson*, 35 Fed. Appx. at 418-19; *Dority*, 2002 U.S.App. LEXIS 21251, at *14 (dismissing claim where plaintiff "had 'not even made a colorable attempt to establish ... that her employer treated similarly situated employees outsider of her class more

favorably'"). As the Seventh Circuit has held, employees "are similarly situated when there is substantial similarity with respect to their performance, qualifications, and conduct." *Spencer*, 30 Fed. Appx. at 640 (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)). In the case before the Court, Collins made no effort to show other employees at ATK "had the same supervisor, were subject to the same standards, and engaged in similar alleged misconduct." *Spencer*, 30 Fed. Appx. at 640.

As a result, this Court is required to dismiss the Collins' claim because it "failed to make out a *prima facie* case for retaliation ... [and] did not demonstrate that [she], unlike similarly-situated colleagues, [was] subject to an adverse employment action even though [she] performed [her] job satisfactorily." *Dority*, 2002 U.S.App. LEXIS 21251, at *18.

Second, even if Collins could establish a *prima facie* case of retaliation, she has "failed to raise a triable issue as to each and every one of [ATK's] stated legitimate, nondiscriminatory reasons for terminating her." *Gould v. Barrett*, 99C7661, 2002 U.S. Dist. LEXIS 5454, at *42 (March 29, 2002) Collins' "burden is to squarely rebut the articulated reason for his discharge." *Plair*, 105 F.3d at 348. "The existence of a genuine issue of triable fact with respect to some of the reasons for discharge proffered by the employer is of no consequence as long as at least one reason is uncontested." *Adreani v. First Colonial Banshares Corp.*, 154 F.3d 389, 399 (7th Cir. 1998). As was articulated before, Collins fails to offer a triable issue of pretext in response to ATK's non-discriminatory reasons for her termination.

For these reasons, Collins' discrimination claims cannot survive ATK's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, ATK's Motion for Summary Judgment is granted.

[#10-1]. This case is hereby terminated. This is a final and appealable order.


SO ORDERED                          ENTERED:  2/26/03

                                    *[signature]*
                                    HON. RONALD A. GUZMÁN
                                    United States Judge